## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ALI RICHARD,<br><br>                    Plaintiff,<br><br>    v.<br><br>WARDEN MARTIN ET AL.,<br><br>                    Defendants. | Civil Action No. 3:20-cv-1354 (CSH)<br><br>**OCTOBER 6, 2022** |

## <u>INITIAL REVIEW ORDER</u>

**HAIGHT, Senior District Judge:**

Plaintiff Ali Richard, a convicted state prisoner, has filed an amended complaint pro se under 42 U.S.C § 1983 and under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, against Wardens Martin and Corcella; Commissioner Scott Semple; Deputy Wardens Nunez and Cotta; Captains Donovan, Williams, and Bellemare; Lieutenant Ocasio; Correctional Officer Rodriguez; Grievance Coordinator Officer King; Property Officers Witowski and Pudvah; and Freedom of Information Act ("FOIA") Officers Spotten and Wright. Richard claims that each of the defendants violated his federally protected rights in connection with the alleged confiscation of his prayer shawl on December 4, 2019. Richard further contends that Property Officer Pudvah again violated his rights by confiscating his prayer shawl and kurta shirt on September 26, 2021. The Court reviews the amended complaint to determine whether Richard's claims may proceed under 28 U.S.C. § 1915A.

# I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1915A(b), the Court must review prisoner civil complaints against governmental actors and "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)–(2). Although detailed allegations are not required, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). However, the Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

2

With respect to pro se litigants, it is well established that "[p]ro se submissions are re-viewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)). *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (internal citations omitted)). This liberal approach, however, does not exempt pro se litigants from the minimum pleading requirements described above: A pro se plaintiff's complaint still must "'state a claim to relief that is plausible on its face.'" *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quot-ing Iqbal, 556 U.S. at 678). Therefore, even in a pro se case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted), and the Court may not "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II. FACTUAL ALLEGATIONS[1]

Richard describes himself as a "devout Moorish-American Moslem" who "diligently and sincerely practices the Moorish Science faith called Islamism." Doc. 15 at 8 ¶ 22. On April 14, 2018, Richard submitted a request to Director of Religious Services, the Rev. Dr. Williams, seeking to purchase a prayer shawl from an outside vendor. *Id.* at 9 ¶ 24. "A prayer shawl is a spiritual scarf used in prayers and meditation to offer spiritual protection and to deepen the faith experience. It is an essential component to Moslems of the Moorish Science Temple." *Id.* ¶ 25.

---

[1] The facts are taken from Richard's amended complaint. Doc. 15.

Director Williams approved the request to purchase a prayer shawl on April 17, 2018, and Richard ordered the shawl shortly thereafter. *Id.* ¶¶ 26–27. When the shawl arrived, property officers photographed it, noted it on Richard's property inventory, and called Richard down to pick it up. *Id.* ¶ 28. Richard proceeded to make daily use of the shawl for prayer and meditation. *Id.* ¶ 29.

At some point during August 2019, prison officials transferred Richard to the Corrigan-Radgowski Correctional Center ("Radgowski"). *Id.* ¶ 30. On December 4, 2019, officers conducted a shakedown of all cells in Radgowski. *Id.* at 10 ¶ 31. Correctional officers entered Richard's dorm and instructed all inmates to put their personal property on their bunks. *Id.* ¶ 32. Richard placed all his property on his bunk, including his prayer shawl. *Id.* Correctional officers escorted all inmates, including Richard, to the gymnasium to be strip-searched. *Id.* ¶ 33. Upon returning to his cell, Richard found his belongings in disarray and doused in some type of liquid. *Id.* at 11 ¶ 35. Also, his prayer shawl was missing. *Id.* ¶ 36. Although Richard was not present when his cell was searched, he expresses certainty that a particular officer—Correctional Officer Rodriguez—confiscated his prayer shawl. *Id*. at 23 ¶ 66.

Richard immediately spoke to Lieutenant Ocasio about his missing prayer shawl. *Id.* at 11 ¶ 37. Lieutenant Ocasio said that he did not think a prayer shawl was important and that a missing prayer shawl was not his problem. *Id.* Richard stated that he wanted his prayer shawl back, that it was of great religious value to him, and that if necessary he would exhaust his legal remedies. *Id.* Lieutenant Ocasio simply said, "[M]ake sure you spell my name right." *Id.* Richard spoke with two correctional officers in his housing unit, one of whom instructed him to speak to a captain about his missing prayer shawl. *Id.* at 11–12 ¶ 38. When Captain Williams entered Richard's dorm, Richard explained that his prayer shawl had been confiscated during the search

4

of his cell and that he had not received any documentation indicating the basis for the confiscation. *Id.* at 12 ¶ 39. Captain Williams said that it was not his problem and walked away. *Id.*

On December 6, 2019, Richard sent written complaints to Warden Corcella, Deputy Wardens Cotta and Nunez, Commissioner Semple, Captain Donovan, and Property Officers Witowski and Pudvah. *Id.* ¶ 40. On December 9, 2019, Property Officer Witowski called Richard down to the property office and informed him that Captain Bellemare had offered him five rap CDs, which had been confiscated from other inmates, in place of his prayer shawl. *Id.* at 12–13 ¶ 41. Richard stated that he did not think it would be fair or spiritually appropriate for him to accept non-religious items in exchange for the prayer shawl. *Id.* Witowski replied, "I have to be honest with you, a lot of officers do not want that kind of headwear in here. I'm trying to save you from future problems." *Id.* Richard responded that he was offended by the offer of another inmate's rap music, which he considers to be "vulgar" and "mundane." Richard was also concerned that the inmate to whom the CDs belonged might assault Richard if he learned that Richard had his property. *Id.* As Richard left the office, Witowski suggested that the value of the CDs was equal to the value of the prayer shawl told Richard to "think about it[.]". *Id.*

Later, Captain Bellemare approached Richard to ask if he was satisfied with the offer of rap CDs. *Id.* at 14 ¶ 43. Bellemare said he had instructed Witowski to make the offer and asked if Witowski had been in touch with him. *Id.* Richard said he had, but reiterated that he did not want any CDs. *Id.* In response, Bellemare offered Richard video games instead. *Id.* Richard rejected this offer as well. *Id.* Bellemare then informed him that he would need to file a claim through the Claims Commissioner. *Id.* at 14–15 ¶ 43. Richard asserted that the Claims Commissioner would not deal with a claim of retaliation or a First Amendment claim and that he felt he was being har-

assed and discriminated against by employees at Radgowski. *Id.* at 15 ¶ 43. Bellemare then mentioned a lawsuit that Richard had previously filed against Department of Correction employees;[2] said, "[W]hen you sue one of us you sue all of us[;]" and suggested that Richard might get his prayer shawl back if he dropped his lawsuit. *Id.*

On December 10, 2019, Property Officer Witowski called Richard down to his office again and asked Richard to bring documentation showing that the Director of Religious Services had approved the purchase of his prayer shawl. *Id.* at 14 ¶ 42. When Richard arrived, Witowski made copies of the approval paperwork and asked Richard if he had spoken to Captain Bellemare about accepting CDs as a replacement for the religious shawl. *Id.* Richard said he had, but that he still wanted his prayer shawl back. *Id.*

Later that day, Property Officer Pudvah called Richard back to the property office. *Id.* at 15 ¶ 44. Pudvah said that Richard had complained of a missing prayer shawl. *Id.* Richard said that it was "not missing, confiscated." *Id.* Pudvah replied, "[O]kay[,] confiscated[,] which you have no proof of." *Id.* Pudvah was not aware that Richard had already met with Property Officer Witowski about his missing prayer shawl. *Id.* Pudvah said that he was going to make a note on a property request form indicating that he had spoken to Richard and that Richard agreed that the property office did not have the prayer shawl. *Id.* Pudvah asked Richard to sign the form acknowledging that the property office did not have the prayer shawl. *Id.* Richard declined to sign the form. *Id.* at 15–16 ¶ 44. Pudvah then became agitated and upset, "got in [Richard's] face in a very hostile, provocative manner[,]" and screamed racial and religious slurs at Richard, calling

---

[2] Richard is the plaintiff in the separate matter of *Richard v. Strom*, No. 3:18-cv-1451 (CSH) currently before this Court. *See Richard v. Strom*, No. 3:18-cv-1451 (CSH), 2018 WL 6050898, at *1 (D. Conn. Nov. 19, 2018); *Richard v. Strom*, No. 3:18-cv-1451 (CSH), 2019 WL 2015902, at *1 (D. Conn. May 7, 2019).

him a "f—ing legal begal [sic]" and a "towel head" and saying that "all of you monk[ey]s [are] the same[.]" *Id.* Shocked and frightened, Richard hurried out of Pudvah's office. *Id.*

When Richard returned to his living quarters, he immediately informed Block Officer Pineda about what happened. *Id.* at 16 ¶ 45. Pineda called Lieutenant Dose, who told Pineda that he would come to speak with Richard, but Dose never did so. *Id.* Richard then wrote to Warden Corcella, Deputy Wardens Nunez and Cotta, and Captain Donovan about Property Officer Pudvah's conduct. *Id.* ¶ 46. He received no response. *Id.* On December 30, 2019, Richard filed a Level 1 grievance regarding his confiscated prayer shawl and Pudvah's conduct. *Id.* at 17 ¶ 47. On January 6, 2020, Grievance Coordinator King instructed Richard to file a request on a CN 9609 form regarding his confiscated property claim. *Id.* at 41 (Ex. C-2). On January 8, 2020, Richard drafted a Level 2 appeal because Grievance Coordinator King had not responded to the allegations in his Level 1 grievance. *Id.* at 17 *Id.* ¶ 48. Richard sent the Level 2 appeal via U.S. Mail to the Director of Security. *Id.* The Level 2 appeal was subsequently returned to him due to process failure. *Id.* ¶ 49. Richard appears to concede that it is not proper to submit grievances through U.S. Mail but contends that he had no alternative, since Radgowski officials had placed a seal over the administrative remedies box where such grievances should have been submitted. *Id.* at 17–18 ¶ 50; *id.* at 75 (June 14, 2022 Affidavit). Richard also asserts that FOIA Liaisons Spotten and Wright refused to respond to multiple requests seeking the preservation of video footage which would have documented the December 4, 2019 confiscation of his prayer shawl and Property Officer Pudvah's December 10, 2019 outburst. *Id.* at 19 ¶ 52.

On September 26, 2021—approximately one year after the filing of the initial complaint in this case—Richard was transferred from Radgowski (which was closing operations) to Brook-

lyn Correctional Institution ("Brooklyn"). *Id.* ¶ 53. Property Officer Pudvah was assigned to pack Richard's personal belongings for transfer. *Id.* While Pudvah went through Richard's property, Richard saw him remove several items and place them aside from the boxes that would be sent to Brooklyn. *Id.* at 20 ¶ 54.

Once he had finished packing Richard's belongings, Property Officer Pudvah presented Richard with a property sheet to sign. *Id.* ¶ 56. Richard initially refused to sign the form, saying, "I don't know if all of my property is even in those boxes." *Id.* Property Officer Pudvah then told Richard that he would not reopen the packed boxes for inspection, and that all of Richard's property would be thrown away unless he signed the form, so Richard's options were to "sign it and get something or do not sign it and get nothing. This facility is shutting down and anything left behind will get trashed." *Id.* Reluctantly, Richard signed his name on the property sheet but wrote "without viewing" next to his signature. *Id.*

When Richard's boxes of property arrived at Brooklyn, Richard noticed two missing items: a prayer shawl and a religious kurta shirt. *Id.* at 21 ¶¶ 57–58.[3] Richard inferred that Property Officer Pudvah had intentionally excluded religious clothing from his boxes as retaliation for the filing of his initial complaint in this case. *Id.* ¶¶ 58–59. Richard subsequently filed Level 1 and 2 grievances related to this second confiscation of religious attire. *Id.* at 22 ¶ 61.

## III. ANALYSIS

Richard invokes the Court's jurisdiction under 42 U.S.C § 1983 and the Court's supplemental jurisdiction over claims asserted under the Connecticut Constitution. Richard contends

---

[3] Richard states that he purchased the kurta shirt on April 3, 2012, and that it is documented on his Inmate Property Inventory Form of February 28, 2021. *Id.* ¶ 60. Richard's amended complaint provides no indication that prison officials ever returned the prayer shawl that was confiscated in 2019. So, presumably,

that the defendants violated his rights under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article First §§ 1, 3, 4, 5, 6, 8, and 16 of the Connecticut Constitution. *Id.* at 22–24 ¶¶ 62–69. He seeks monetary damages from the defendants in their individual capacities and a declaratory judgment regarding their conduct. *Id.* at 24–25.

### A. Declaratory Relief under Section 1983

Richard seeks a declaration that the acts and omissions described in the complaint were illegal. *Id.* at 25. Declaratory relief operates prospectively to enable parties to adjudicate claims before either side suffers great damages. *See In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d Cir. 1998). Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000). Richard's request for a declaration that the defendants violated his rights under federal law in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief") (citations omitted).

Furthermore, if Richard prevails on his claims asserted under the First, Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments, the Court would necessarily determine that the de-

---

he had by now acquired a new prayer shawl.

fendants had violated his constitutional rights. Thus, a separate award of declaratory relief is unnecessary. *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action. . . . [and] is dismissed.") (citation omitted).[4] Accordingly, the request for a declaratory judgment is dismissed insofar as the remedy relates to Richard's constitutional claims. *See* 28 U.S.C. § 1915A(b)(1). As will be explained, however, this Court will permit declaratory relief as a potential remedy for Richard's RLUIPA claims.

### B. First Amendment Free Exercise

Richard asserts claims that the multiple confiscations of his prayer shawls, and single confiscation of his kurta shirt, deprived him of the right to practice his religion in violation of the First Amendment. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 283 U.S. 342, 348 (1987); *see also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."). But a prisoner's right to exercise his or her religion is not absolute and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Accordingly, a prisoner's free exercise

---

[4] *See also Rodriguez v. Cook*, No. 3:20-cv-1902 (CSH), 2022 WL 4104100, at *9 (D. Conn. Sept. 8, 2022); *Shand v. Parsons*, No. 3:20-CV-28 (CSH), 2022 WL 2981593, at *10 (D. Conn. July 28, 2022).

claim must be judged "under a 'reasonableness' test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks and citation omitted).

To state a First Amendment free exercise claim, a plaintiff "must make a threshold showing that 'the disputed conduct substantially burden[ed] his sincerely held religious beliefs.'" *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 274–75). Specifically, a plaintiff must allege facts showing that he or she sincerely holds a particular belief, that the belief is religious in nature, and that the challenged action substantially burdened his or her exercise of that belief. *See Ford*, 352 F.3d at 588–91. A belief is substantially burdened where the state has "put[] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (internal quotation marks and citation omitted). In considering whether a prisoner has made the required showing, the Court does not "evaluate the objective reasonableness of the prisoner's belief" but considers only whether the prisoner "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

Richard alleges that he is a "devout Moorish-American Moslem." Doc. 15 at 8 ¶ 22. He used prayer shawls—which were confiscated on December 4, 2019 and, again, on September 26, 2021—for "prayers and meditation to offer spiritual protection and to deepen [his] faith experience." *Id.* at 9 ¶ 25. According to Richard, prayer shawls are essential to all "Moslems of the Moorish Science" faith. *Id.* Richard also states that his confiscated kurta shirt is used in prayer, though he does not specify exactly how essential this attire is to his practice of religion. *Id.* at 21

¶ 58. Richard's allegations, taken together and construed liberally, state a plausible claim that the use of the prayer shawl and kurta shirt are an important part of his sincerely held religious beliefs. *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("The exercise of religion often involves not only belief and profession but the performance of physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine.") (internal citation omitted).

    1.    *Officer Rodriguez, Captains Bellemare and Williams, Lieutenant Ocasio, and Property Officers Witowski and Pudvah*

Richard alleges that on December 4, 2019, Officer Rodriguez confiscated his prayer shawl during a search of his cell. Immediately after he realized that his shawl had been confiscated, Richard spoke to Lieutenant Ocasio and Captain Williams. But these officers refused to investigate or secure the return of his prayer shawl. On December 9 and 10, 2019, Property Officers Witoski and Pudvah and Captain Bellemare refused or failed to return Richard's prayer shawl to him and, instead, offered him rap CDs to replace the shawl. Richard asserts that he cannot engage in meaningful prayer and meditation according to the dictates of his religion without the use of his prayer shawl. These allegations state a plausible claim that Richard's sincerely held religious beliefs were substantially burdened by the confiscation of his prayer shawl by Officer Rodriguez and, subsequently, by the refusal of Property Officers Witowski and Pudvah, Lieutenant Ocasio, and Captains Williams and Bellemare to return his prayer shawl. Richard has, thus, asserted plausible First Amendment free exercise claims against Officer Rodriguez, Property Officers Pudvah and Witowski, Lieutenant Ocasio, and Captains Bellemare and Williams in their individual capacities.

Richard also alleges that his prayer shawl was confiscated again, this time along with a

kurta shirt, On September 26, 2021. According to Richard's complaint, Property Officer Pudvah intentionally excluded Richard's religious attire when packing his box of items to be transferred to Brooklyn. Richard does not contend that any other officers were involved in this second confiscation. Thus, Richard has asserted a second plausible First Amendment free exercise claim related to the September 26, 2021, confiscation of his prayer shawl and kurta shirt against Property Officer Pudvah.

### 2. Wardens Martin and Corcella, Deputy Wardens Cotta and Nunez, Commissioner Scott Semple, and Captain Donovan

A plaintiff seeking to recover monetary damages under section 1983 from a defendant in his or her individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). A government or prison official is not personally involved in a constitutional violation simply because he or she was the supervisor of other defendants who may have violated the plaintiff's constitutional rights. *See Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) ("Liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant") (citation omitted).

Richard alleges that he sent written complaints to Warden Corcella, Deputy Wardens Cotta and Nunez, Commissioner Semple, and Captain Donovan regarding the 2019 confiscation of his prayer shawl. While Warden Corcella perfunctorily responded to Richard's letter, no other defendant appears to have responded to Richard's complaints. Doc. 15 at 44 (Ex. C-5). In his

13

amended complaint, Richard makes no allegations whatsoever that pertain to Warden Martin.[5]

In *Tangreti v. Bachmann*, the Second Circuit considered the impact of the Supreme Court's decision in *Iqbal* on the standard to be applied to determine supervisory liability in a section 1983 action. *Tangreti v. Bachmann*, 983 F.3d 609, 615–18 (2d Cir. 2020). The Court concluded that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). Thus, "[t]he violation must be established against the supervisory official directly." *Id.*

There are no allegations that Wardens Martin or Corcella, Deputy Wardens Cotta or Nunez, Commissioner Semple, or Captain Donovan were involved in the confiscation of Richard's prayer shawl. Nor are there any allegations that these defendants were directly involved in the alleged refusal to return Richard's prayer shawl. Thus, Richard has not alleged that the conduct of Wardens Martin or Corcella, Deputy Wardens Cotta or Nunez, Commissioner Semple, or Captain Donovan resulted in the deprivation of his First Amendment right to practice his religion. Accordingly, the First Amendment free exercise claims asserted against these defendants are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### C. RLUIPA

RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling gov-

---

[5] In his initial complaint, Richard alleged that sent a written complaint to Warden Martin months following the confiscation of his prayer shawl and received a perfunctory response. Doc 1 at 17 ¶ 48.

ernmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). In practice, RLUIPA claims are evaluated under a burden-shifting framework whereby a plaintiff must first demonstrate that the state has imposed a substantial burden on the exercise of his or her religion; the burden then shifts to the state to demonstrate "that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing 42 U.S.C. § 2000cc–1(a)).

The Court liberally construes Richard's allegations to state a claim that the confiscation of his prayer shawl by Officer Rodriguez substantially burdened the practice of his chosen faith. The Second Circuit has held, however, that RLUIPA "does not authorize monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (citations omitted). Thus, a plaintiff may only obtain injunctive or declaratory relief as a remedy for a RLUIPA violation. *See Booker v. Graham*, 974 F.3d 101, 107–08 (2d Cir. 2020) ("RLUIPA provides only for injunctive and declaratory relief when a prison violates an inmate's religious rights.") (citing *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013)). Accordingly, any claims asserted against the defendants in their individual capacities for a violation of RLUIPA or in their official capacities seeking monetary damages for a violation of RLUIPA must be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Richard includes no request for injunctive relief but does include a request for declaratory relief from the defendants. Doc. 15 at 25. For the same reasons that the Court has permitted Richard's First Amendment Free Exercise Clause claims to proceed against Officer Rodriguez, Property Officers Pudvah and Witowski, Lieutenant Ocasio and Captains Bellemare and Wil-

15

liams, the Court will allow his RLUIPA claims to proceed against the defendants in their official capacities to the extent that he seeks declaratory relief. *See Braun v. Sterno*, No. 3:18-CV-919 (JCH), 2018 WL 5778248, at *5 (D. Conn. Nov. 2, 2018) (permitting RLUIPA claims to proceed based on same factual allegations as First Amendment free exercise claims).

### D. First Amendment Retaliation

Richard alleges that the defendants confiscated and failed to return his prayer shawl in retaliation for exercising his right to free speech through the filing of lawsuits against other Department of Correction employees. And, specifically with respect to Property Officer Pudvah, Richard contends that his religious attire was confiscated a second time in retaliation for his filing this very lawsuit.

A district court must "'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)). Thus, retaliation claims "stated in wholly conclusory terms" are insufficient. *Dolan*, 794 F.3d at 295 (internal quotation marks and citations omitted).

To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted). "[A]dverse action on the part of the defendants" is defined as conduct "that would deter a similarly situated

individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchack*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Davis*, 320 F.3d at 353). As to the third requirement, the plaintiff must show that "the protected conduct was a substantial or motivating factor" for the defendant's action. *Holland,* 758 F.3d at 225 (citation and internal quotation marks omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *Dolan*, 794 F.3d at 294. Because Richard alleges that Correctional Officer Rodriguez, Property Officer Pudvah, and Lieutenant Bellemare retaliated against him for the constitutionally protected activity of filing a lawsuit (in the case of Property Officer Pudvah, the filing of multiple lawsuits), he meets the first element of the retaliation claims asserted against these defendants.

Although the Second Circuit has not addressed whether a prison official's search of an inmate's cell *per se* constitutes adverse action, district courts within the circuit have recognized that while searches alone may not be actionable, inmates "can assert a retaliation claim for [defendants'] conduct in conjunction with [a] cell search." *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. April 22, 2005); *see also Steward v. Richardson*, No. 15-CV-9034 (VB), 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) ("Considered collectively, as they ought to be, plaintiff's allegations of retaliatory cell searches and destruction of his property are sufficient to state a claim."). The Court considers the conduct of Officer Rodriguez in confiscating Richard's prayer shawl during the cell search and the suggestion that Property Officer Pudvah and Lieutenant Bellemare would not return the shawl to be sufficiently adverse to meet the second element of a retaliation claim. The subsequent 2021 confiscation of Richard's prayer shawl and kurta is, likewise, sufficiently adverse to meet the second element of a retaliation claim.

Richard contends that Officer Rodriguez confiscated his prayer shawl during the cell search, and that Property Officer Pudvah and Lieutenant Bellemare subsequently refused to return the shawl, because he had filed a lawsuit against other correctional officers. In support of this allegation, Richard alleges that during a conversation with Lieutenant Bellemare on December 9 or 10, 2019, Bellemare told him that "when you sue one of us you sue all of us[,]" and mentioned dropping his lawsuit as a means to secure the return of his prayer shawl. Richard also alleges that on December 10, 2019, Property Officer Pudvah implicitly made reference to his lawsuit in connection with his refusal to return the prayer shawl.[6] Review of this Court's docket reflects that Richard filed a civil rights complaint against two attorneys and employees of the MacDougall-Walker Correctional Institution claiming a denial of his right to practice his religion in January 2018, *Richard v. Strom et al.*, No. 3:18-cv-1451 (CSH). None of the defendants named in that case are named as defendants in this lawsuit.

With respect to Rodriguez, Richard alleges simply that he was the officer who confiscated his prayer shawl during the cell search on December 4, 2019. Richard stated that all cells in the facility were searched that day. Thus, his cell was not singled out to be searched. Nor does Richard allege that he was the only inmate to have an item of property confiscated from his cell during the search. Furthermore, Richard does not allege that Rodriguez was aware of the lawsuit that he had filed against employees at MacDougall-Walker, that he spoke to Rodriguez either before or after the search about the lawsuit, or that Rodriguez made any comments regarding his pending lawsuit. Thus, Richard's allegations do not support an inference that Rodriguez retaliated against him by confiscating his prayer shawl. *See, e.g.*, *Wright v. Goord,* 554 F.3d 255, 274

---

[6] Richard asserts that Officer Pudvah called him a "legal begal [sic]" while berating him for refusing to sign a form absolving officials of responsibility for his missing shawl. Doc 15 at 16 ¶ 44.

(2d Cir. 2009) (affirming dismissal for retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Henderson v. Vanderwerff*, No. 9:13-cv-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016) ("When a plaintiff alleges retaliatory adverse action by one officer for a grievance filed against another officer, the plaintiff faces a heightened burden of establishing a causal connection.") (citing *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, *18 (N.D.N.Y. Aug. 29, 2014) ("[I]t is difficult to establish one defendant's retaliation for complaints against another defendant")); *Hare v. Hayden*, No. 09 CIV. 3135 RWS, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (concluding plaintiff had "fail[ed] to establish causal link between her complaints" against Reverend Lopez and Superintendent Hayden's decision to remove plaintiff from her position as a clerk in the Catholic Chapel at the Bedford Hills Correctional Institution). Accordingly, the retaliation claim against Officer Rodriguez will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Because Lieutenant Bellemare, and possibly also Property Officer Pudvah, alluded to Richard's prior lawsuit filed against Department of Correction employees, and Bellemare further suggested that Richard might secure the return of his prayer shawl if he dropped his lawsuit, a causal connection may be inferred between the filing and pendency of the prior lawsuit and the refusal to return his prayer shawl. Thus, the Court will permit the retaliation claims asserted against Lieutenant Bellemare and Property Officer Pudvah to proceed for further development of the record.

With respect to Richard's second retaliation claim against Property Officer Pudvah, the Court finds that a causal connection may be inferred between the filing and pendency of a law-

19

suit (this very case) and the confiscation of his prayer shawl and kurta. Accepting the factual premises of Richard's claim, as this Court must during initial screening, it is plausible that Property Officer Pudvah was motivated by this pending litigation when he decided to confiscate Richard's religious clothing. Thus, the Court will permit the second retaliation claim asserted against Property Officer Pudvah to proceed for further development of the record.

### E. Fourth Amendment

Richard contends that Officer Rodriguez and Property Officer Pudvah violated his Fourth Amendment rights by seizing his religious clothing. The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526–30 (1984). Nor is the Fourth Amendment applicable to seizures of inmate property by prison officials. *See id.* at 528 n.8 ("the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures"). Thus, an inmate-plaintiff cannot substantiate a Fourth Amendment claim against prison officials simply by showing that his or her belongings have been confiscated. *See Conquistador v. Syed*, No. 3:19-CV-1450 (KAD), 2020 WL 229319, at *4 (D. Conn. Jan. 15, 2020) (allegation that inmate's "television and sneakers" were confiscated while inmate was being transported between correctional facilities did not state a claim of an

unreasonable seizure under the Fourth Amendment); *Gulino v. Crossdale*, No. 3:12-CV-156 (JCH), 2012 WL 3656403, at \*2–3 (D. Conn. Aug. 24, 2012) (conduct of correctional officers in removing religious article from inmate's possession prior to his placement in the restrictive housing unit did not state a viable claim of an unreasonable seizure in violation of the Fourth Amendment); *Stewart v. Ayala*, No. 3:20-cv-1938 (CSH), 2022 WL 4356467, at \*13 (D. Conn. Sept. 20, 2022) (Fourth Amendment claims by inmate-plaintiffs are limited to conduct occurring during "a criminal investigation or other form of governmental investigation or activity") (quoting *Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir. 2002)). Accordingly, Richard's Fourth Amendment claims will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### F. Fifth Amendment

Richard alleges that the defendants violated his right to due process in connection with the 2019 and 2021 confiscations of his religious attire. The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . shall be deprived of life, liberty, or property without due process of law. . . ." U.S. Const. amend. V. The Fifth Amendment applies to the federal government and not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Because the defendants in this action are all state employees, the Fifth Amendment is inapplicable to the due process claims asserted against them. The Fifth Amendment due process claims will thus be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### G. Eighth Amendment

Richard alleges that the defendants harassed him in violation of his right not to be sub-

jected to cruel and unusual punishment. But the Second Circuit has held that a small number of incidents of verbal harassment by a prison official typically do not constitute a violation of the Eighth Amendment. *See Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("The isolated episodes of [verbal] harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court."); *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000) (stating that "rudeness and name-calling do[] not rise to the level of a constitutional violation").

To survive initial review, the prisoner must make a substantial showing that he or she experienced an "appreciable injury" rising to a constitutional violation. *See Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (instructing district court to consider whether plaintiff's "psychological pain" and subsequent suicide attempt caused by non-physical sexual harassment constituted an "appreciable injury" that was actionable); *Johnson v. Cook*, No. 3:19-cv-1464 (CSH), 2021 WL 2741723, at *10 (D. Conn. July 1, 2021) (allowing Eighth Amendment claim to proceed where officers made "demeaning and derogatory comments" and "transgender-phobic slurs" regarding an inmate-plaintiff's gender transition, which caused other inmates to laugh and throw food at the plaintiff and caused plaintiff to feel "insecure, scared, [and] traumatized" and to "ha[ve] suicidal thoughts"); *Timm v. Faucher*, No. 3:16-cv-00531 (VAB), 2017 WL 1230846, at *5–6 (D. Conn. Mar. 31, 2017) (collecting cases to distinguish *de minimis*, generic, or belated allegations of emotional distress from ones serious and specific enough to support an Eight Amendment claim, *e.g.*, of "depression, nausea, hyperventilation, headaches, insomnia, dizziness, and/or weight loss") (citation and quotation marks omitted).

Here, Richard does not allege that Property Officer Pudvah's outburst (which included religious and racial slurs) constituted sexual harassment, or that he suffered psychological harm on par with suicidal thoughts. *See* Doc. 15 at 15–16 ¶¶ 44–45. Rather, he states that he was "in shock and fear for his safety." *Id.* at 16 ¶ 44. This is insufficient. *Cf. Jackson v. Moochie*, No. 3:19-cv-1057 (VAB), 2019 WL 6486119, at *6 (D. Conn. Dec. 3, 2019) ("The fact that the verbal harassment caused Mr. Jackson to fear his own safety is insufficient to show such an injury."). Since Richard has not alleged facts to support a finding that he has been subjected to cruel and unusual punishment, his Eighth Amendment claims must be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### *H. Ninth Amendment*

Richard contends that the defendants violated his Ninth Amendment rights. It is difficult to discern from the allegations in the complaint, however, the asserted basis for any such claim.

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Amendment is a rule of construction rather than an independent source of constitutional rights. *See Griswold v. Connecticut*, 381 U.S. 479, 492 (1965); *Jenkins v. Comm'r of I.R.S.*, 483 F.3d 90, 92–93 (2d Cir. 2007). The Ninth Amendment's rule of construction "dictates that 'the full scope of the specific guarantees in the Constitution is not limited by the text, but embraces their purpose.'" *Jenkins*, 483 F.3d at 92–93 (quoting *United States v. Bifield,* 702 F.2d 342, 349 (2d Cir.1983)). Because a § 1983 claim must be premised on the violation of a right guaranteed by the United States Constitution or federal law, the Ninth Amendment, which concerns only unenumerated rights, cannot serve as the basis for a section 1983

claim. Thus, Richard's Ninth Amendment claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### I. Fourteenth Amendment Equal Protection

Richard alleges that the defendants failed to afford him equal treatment, discriminated against him based on his religion, and engaged in racist conduct towards him. The Equal Protection Clause of the Fourteenth Amendment protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather, it requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985).

To state an equal protection claim, a plaintiff must allege facts showing that he or she was treated differently from similarly situated individuals and that the difference in treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quotation marks and citation omitted). A "plaintiff need not show . . . that a government decisionmaker was motivated solely, primarily, or even predominantly" by the improper classification; rather, it is sufficient that such classification was "a motivating factor." *United States v. Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996). Intentional discrimination claims can be proven by, *inter alia*, pointing to laws that contain express discriminatory classifications, identifying a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or demonstrating that a facially neutral statute had an adverse effect and was motivated by discriminatory animus. *Brown v. City of Oneonta*, 221 F.3d 337 (2d Cir. 2000).

Richard does not articulate the basis of his claim that the defendants engaged in racial

and religious discrimination. As best as the Court can discern, the claims appear to stem from two sets of comments. The first are those allegedly made by Property Officer Witowski on December 9, 2019, when he warned Richard that "a lot of officers do not want that kind of head wear in here. I'm trying to save you some future problems." Doc. 15 at 14 ¶ 41. The second are those made by Property Officer Pudvah when he allegedly directed profane and bigoted insults toward Richard, including calling him a "f—ing towel head" and stating, "all of you monkies [sic] [are] the same[.]". *Id.* at 16 ¶ 44.

Verbal harassment alone, even when vile, does not amount to a constitutional deprivation. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (holding that name-calling without "any appreciable injury" did not violate inmate's constitutional rights); *see also D'Attore v. New York City,* No. 10–CV–6646 (WHP)(JCF), 2012 WL 2952853, at *6 (S.D.N.Y. July 19, 2012) (citing *Baskerville v. Goord,* No. 97–CV–6413, 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("Mere verbal abuse or the use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to [§] 1983.")); *Haussman v. Fergus,* 894 F. Supp. 142, 149 n. 20 (S.D.N.Y. 1995) ("Offensive racial comments cannot form the basis of a § 1983 claim."). Richard does not allege that he had any other immediate contact with either Officer Witowski or Officer Pudvah after these incidents of verbal harassment and derogatory racial and religious comments. The claims of verbal harassment do not state a claim under the Equal Protection Clause of the Fourteenth Amendment.

Richard does not allege that these two defendants, nor any of the other defendants, treated him differently than other similarly situated individuals. Thus, he has failed to state a plausible equal protection claim under the Fourteenth Amendment, because at the heart of that clause is

25

the element of comparison. *See, e.g., Rossi v. Fishcer*, No. 13-CV-3167 PKC DF, 2015 WL 769551, at *13 (S.D.N.Y. Feb. 24, 2015) ("Courts in the Second Circuit have empha-sized that 'it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently.'") (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)); *King v. New York State Div. of Parole*, 260 F. App'x 375, 379–80 (2d Cir. 2008) (affirming dis-missal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Indeed, in Richard's other pending case, the Court permitted his equal protection claim to proceed because he "allege[d] that he was denied to permission to purchase a fez [an essential component of his religion] while members of the Nation of Islam and the Five Percenters [were] permitted to purchase crowns, notwithstand-ing the fact that fezzes and crowns are very similar in design." 2018 WL 6050898, at *6. Here, Richard points to no such comparators, so his Fourteenth Amendment equal protection claims must be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### J. Fourteenth Amendment Due Process: Property

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property." U.S. Const. amend. XIV. But a claim for confiscation or loss of property is not cognizable in a § 1983 action such as this. The Supreme Court has found that the Due Process Clause of the Fourteenth Amendment is not violated when a prison inmate loses personal belongings due to the negligent or intentional actions of correctional officers if the state provides an adequate post-deprivation compensatory remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543 (1981).

The State of Connecticut provides an adequate remedy for the kind of deprivation that

26

Richard alleges through its Department of Correction Administrative Directives and under Connecticut statutes. Administrative Directive 9.6(16) provides that the Department of Correction's "Lost Property Board shall hear and determine any claim by an inmate in a correctional facility who seeks compensation not exceeding . . . ($3,500.00) for lost or damaged personal property" and that an inmate may pursue his property claim with the Connecticut Claims Commissioner if the Board denies the claim completely or in part.[7] Conn. Gen. Stat. § 4-141 *et seq.* provides that claims for payment or refund of money by the state may be presented to the Office of the Connecticut Claims Commissioner. Here, Richard makes no allegation that the confiscated items exceed $3,500.00 in monetary value. And state remedies are not inadequate simply because an inmate anticipates a more favorable remedy under the federal system, or that it may take a longer time under the state system before his case is resolved. *See Hudson*, 468 U.S. at 535.

With his complaint, Richard attaches a January 6, 2020, response to a grievance by Administrative Remedies Coordinator Officer King instructing him to file a CN 9609, Lost/Damaged Property Investigation Form regarding the lost prayer shawl in accordance with Administrative Directive 9.6(16)(B). Doc 15 (Ex. C-2) at 41. And, in a grievance filed on March 28, 2020, Richard refers to having received a receipt on January 21, 2020, for a CN 9609, Lost/Damaged Property Investigation Form that he filed regarding his lost/confiscated prayer shawl. Doc 15 (Ex. J-1) at 60. But Richard does not allege that he exhausted all available remedies with the Department of Correction's Lost Property Board or with the Office of the Claims Commission or that the State of Connecticut's procedures for processing property claims are inadequate. *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (affirming dismissal of in-

---

[7] *See* State of Connecticut Department of Correction Administrative Directive 9.6, http://portal.ct.gov/DOC/AD/AD-Chapter-9.

mate's deprivation of property claim on the ground that the inmate had not asserted facts to show that the process provided by the State of Connecticut, including the opportunity to seek relief through the Office of the Claims Commissioner, was inadequate to compensate him for the deprivation of his property); *Edwards v. Erfe*, 588 F. App'x 79, 80–81 (2d Cir. 2015) (same).

As the Department of Correction and State of Connecticut provide adequate post-deprivation remedies, Richard has not stated a plausible claim of a deprivation of property under the Fourteenth Amendment. His Fourteenth Amendment due process claims related to the alleged loss or confiscation of his religious attire will therefore be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### K. First and Fourteenth Amendments: Grievances

The Second Circuit has held that neither state directives nor "state statutes . . . create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's rights under First or Fourteenth Amendment, including the First Amendment right to petition the government for the regress of grievances. *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established . . . that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases); *Stewart*, 2022 WL 4356467, at *14–15 ("Plaintiff cannot allege a plausible Section 1983 claim based on interference with his administrative remedies . . . [and] prison staff interference

with Plaintiff's administrative remedies does not give rise to a denial of access to the courts in violation of the U.S. Constitution."). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest.")).

Richard alleges that Grievance Coordinator King failed to make administrative remedy boxes accessible to inmates and inappropriately refused to process grievances that he attempted to submit. These allegations could, potentially, affect the defendants' ability to successfully invoke Richard's failure to exhaust remedies as an affirmative defense to Richards' surviving claims. *See Stewart*, 2022 WL 4356467, at *15; *Baltas v. Erfe*, No. 3:19-cv-1820 (MPS), 2020 WL 1915017, at *33 (D. Conn. Apr. 20, 2020) (noting that the PLRA only requires inmate-plaintiffs to exhaust *available* administrative remedies). But they do not give rise to any constitutional cause of action. Thus, Richards' First and Fourteenth Amendment grievance process claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## *L. Freedom of Information Act*

Richard alleges that he submitted requests under Connecticut's Freedom of Information Act, Conn. Gen. Stat. Ann. § 1-210 (West 2022), to FOIA Liaisons Spotten and Wright for the preservation of video evidence that would serve to corroborate claims brought in this case. He further claims that both Spotten and Wright have refused to respond to these multiple requests.

As with Richard's allegations regarding the grievance program, his allegation

that FOIA Liaisons Spotten and Wright did not comply with Connecticut law does not state a claim that his federally protected rights were violated. *See Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011) ("[F]ailure to comply with a state law or administrative directive does not by itself establish a violation of § 1983.") (citing *Doe v. Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990)); *Old St. George's LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010) (summary order) ("Finally, with respect to appellants' claims relating to the alleged inter-ference by officials of the Town of Yorktown with appellants' ability to access the Town's pub-lic records, we agree with the district court that the complaint alleges, at best, only a violation of New York's Freedom of Information Law, and not a federal constitutional claim.") (citing *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("[A] violation of state law is not cog-nizable under § 1983.")).

Furthermore, there are no allegations to suggest that Richard had no other recourse when FOIA Liaisons Spotten and Wright allegedly failed to timely respond to his FOIA re-quests. *See* Conn. Gen. Stat. § 1–206(b)(1) ("Any person denied the right to inspect or copy rec-ords under section 1–210 or wrongfully denied the right to attend any meeting of a public agency or denied any other right conferred by the Freedom of Information Act may appeal therefrom to the Freedom of Information Commission, by filing a notice of appeal with said commission. A notice of appeal shall be filed within thirty days after such denial . . . ."). Richard's allegations that FOIA Liaisons Spotten and Wright FOIA neglected to process or timely process his requests submitted under Connecticut's FOIA will be dismissed for failure to state a plausible violation of his federally protected rights. *See* 28 U.S.C. § 1915A(b)(1).

*M. Section 1988*

In addition to the claims asserted under 42 U.S.C. § 1983 and RLUIPA, Richard asserts

claims under 42 U.S.C. § 1988. But this section does not provide for an independent cause of

action. *See Moor v. Alameda County,* 411 U.S. 693, 702–06 ("[Section 1988] was obviously in-

tended to do nothing more than to explain the source of law to be applied in actions brought to

enforce the substantive provisions of the [the 1966 Civil Rights Act].", *reh'g denied,* 412 U.S.

963 (1973). Rather, it permits a district court, "in its discretion, [to] allow the prevailing party,

other than the United States, a reasonable attorney's fee as part of the costs" of bringing a lawsuit

under Section 1983 or various other civil rights provisions. 42 U.S.C. § 1988(b). A pro

se litigant, however, is not entitled to attorneys' fees under section 1988. *See Kay v. Ehrler,* 499

U.S. 432, 435 (1991). Thus, any claims asserted by Richard under 42 U.S.C. § 1988 will be dis-

missed. *See* 28 U.S.C. § 1915A(b)(1).

*N. Connecticut Constitution*

Richard alleges that the defendants deprived him of his rights under Article First §§ 1, 3,

4, 5, 6, 8, and 16 of the Connecticut Constitution. Article First § 1 provides that "[a]ll men when

they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive

public emoluments or privileges from the community." Article First § 3 provides in pertinent

part that "[t]he exercise and enjoyment of religious profession and worship, without discrimina-

tion, shall forever be free to all persons in the state; provided, that the right hereby declared and

established, shall not be so construed as to . . . justify practices inconsistent with the peace and

safety of the state." Article First § 4 provides that "[e]very citizen may freely speak, write and

publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article

First § 5 provides that "[n]o law shall ever be passed to curtail or restrain the liberty of speech or of the press." Article First § 6 provides that "[i]n all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Article First § 8 provides that "[n]o person shall be . . . deprived of life, liberty or property with due process of law . . . ." Article First § 16 provides that "[t]he military shall, in all cases, and at all times, be in strict subordination to the civil power."

In *Binnette v. Sabo*, 710 A.2d 688, 693–99 (1998), the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), to recognize a private cause of action for monetary damages against municipal police officers for violations of Article First §§ 7 and 9 of the Connecticut Constitution that arose out of an alleged unreasonable search and seizure and unlawful arrest of the plaintiff. But, in reaching its decision, the Connecticut Supreme Court "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47, 710 A.2d at 700.

### 1. Article First Sections One, Three, and Eight

There is no established private right of action under the equal protection, religious discrimination, or due process provisions (Article First §§ 1, 3, and 8, respectively) of the Connecticut Constitution. Accordingly, courts in this district have routinely declined to exercise supplemental jurisdiction over state constitutional claims stemming from these provisions.[8] Given that

---

[8] *See, e.g.*, *Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) ("The court finds that there is no private cause of action for monetary damages under the equal protection and due process provisions (Art. First, §§ 1, 8 and 20) of the Connecticut Constitution."); *Richard v. Strom*, 2018 WL 6050898, at *8 (concluding "[t]here is no established private right of action under the religious discrimination, due process, or equal protection provisions (Article First §§ 3, 8, and 20)"); *Doe v.*

the provisions at issue raise novel and undeveloped issues of state law, and out of deference to the State as the final arbiter of its own constitution, the Court declines to exercise supplemental jurisdiction over the claims that the defendants violated Richard's rights under Article First §§ 1, 3, and 8 of the Connecticut Constitution. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the claim raises a novel or complex issue of State law.").

### 2. *Article First Sections Four and Five*

The Connecticut Supreme Court has held that Article First § 5 "literally applies only to the passage of laws restraining freedom of speech or press and does not by its terms afford protection provided by § 4 against restrictions the exercise of those rights which government officials may impose whether or not sanctioned by law." *Cologne v. Westfarms Associates,* 192 Conn. 48, 63, 469 A.2d 1201, 1209 (1984). Richard does not challenge a state statute as being violative of his right to free speech. Thus, Richard has failed to state a claim of a violation of Article First § 5 and the claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1). *See Niblack v.*

---

*Mastroloni*, 3:14-CV-00718 (CSH), 2016 WL 593439, at *16–17 (D. Conn. Feb. 1, 2016) (declining to exercise supplemental jurisdiction over state constitutional provisions, including Article First §§ 3, 8, and 20, where state courts have declined to recognize private right of action) (citing cases); *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 187–88 (D. Conn. 2015) (declining to exercise supplemental jurisdiction over state constitutional claim under Article First § 8); *Lopez v. Smiley*, 375 F. Supp. 2d 19, 25 (D. Conn. 2005) (declining to exercise supplemental jurisdiction over claims for money damages and declaratory and injunctive relief based on violations of, *inter alia*, Article First § 8 of the Connecticut Constitution); *Traylor v. Hammond*, 94 F. Supp. 3d 203, 222 (D. Conn. 2015) ("Given that Traylor raises novel and undeveloped issues of state law, and out of the deference owed to the State as the final arbiter of its own Constitution, the court, in its discretion, declines to exercise supplemental jurisdiction over the claims against Keating and New London under [Article. First, §§ 1, 20 of] the Connecticut Constitution.") (internal quotation marks and citation omitted); *Crowley v. Town of Enfield*, No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize private right of action under Article First §§ 8 and 20); *Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) ("The court finds that there is no private cause of action for monetary damages under the equal protection and due process provisions [Art. First §§ 1, 8, and 20] of the Connecticut Constitution.").

*Brighthaupt*, No. CV155035513, 2018 WL 1386211, at *5 (Conn. Super. Ct. Feb. 20, 2018) (dismissing inmate's claim that rejection and return of packages by mail room staff at prison facility violated his right to free speech under Article First § 5 of the Connecticut Constitution because claim did not relate to the passage of a law restraining freedom of speech and observing that violation of his right to free speech derived from Article First § 4 of the Connecticut Constitution) (citing *Cologne*, 469 A.2d at 1209).

In *Lopez v. Smiley*, the Court acknowledged that the Connecticut Supreme Court had recognized a private right of action under Article First §§ 4 and 14 for declaratory or injunctive relief but noted the absence of Connecticut state court cases recognizing a private right of action for monetary damages under Article First § 4. *See Lopez v. Smiley*, 375 F. Supp. 2d 19, 24 n.2 (D. Conn. 2005) (collecting cases). The Court thus refrained "from exercising supplemental jurisdiction over all of Mr. Lopez's Connecticut constitutional claims (both those seeking monetary damages and those seeking injunctive or declaratory relief)." *Id.* at 26.

No cases since *Lopez* appear to have recognized a claim for monetary damages under Article First, § 4. *Cf. Williams v. Walter Ford*, No. 3:14-cv-1181 (VAB), 2015 WL 8490910, at *9 (D. Conn. Dec. 10, 2015) (finding "no state cases recognizing a claim for money damages under this [free speech] provision" of the Connecticut Constitution) (citing *Marshall v. Town of Middlefield*, No. 3:10-cv-1009 (JCH), 2012 WL 601783, at *9 (D. Conn. Feb. 23, 2012) ("The court finds no cases in which a Connecticut court has recognized a private right of action for money damages under either section four or twenty and multiple cases in which courts have expressly declined to recognize such claims.")). Nor has the Court found any cases recognizing a retalia-

34

tion claim asserted directly under Article First § 4.[9]

Furthermore, any requests asserted against the defendants in their official capacities for injunctive or declaratory relief for violations of the Connecticut Constitution would be barred by the Eleventh Amendment. *See Vega v. Semple*, 963 F.3d 259, 283–84 (2d Cir. 2020) (holding plaintiff's claims for "prospective relief against Defendants in their official capacity for violations of the Connecticut Constitution and state law . . . are indeed barred by the Eleventh Amendment under the *Pennhurst* doctrine.") (internal quotation marks omitted).

Accordingly, the Court declines to exercise supplemental jurisdiction over any claim asserted under Article First § 4 of the Connecticut Constitution. *See Kelly v. Santiago*, No. 3:18-cv-01796 (VAB), 2019 WL 3574631, at *11–13 (D. Conn. Aug. 6, 2019) ("Although Mr. Kelly includes requests for declaratory and injunctive relief in his prayer for relief, his state claim [asserted under Article First § 4] is best adjudicated with state courts and the Court declines to exercise supplemental jurisdiction over this claim.") (citing 28 U.S.C. § 1367(c)).

### 3. Article First Sections Six and Sixteen

The Court cannot discern how either Article First § 6 of the Connecticut Constitution, titled, "Prosecutions for libel; defenses," or Article First § 16 of the Connecticut Constitution, titled, "Military power subordinate to civil," would apply to the factual allegations asserted by Richard in his complaint. He alleges no facts regarding a criminal proceeding or a military matter. The claims asserted under Article First §§ 6, 16 of the Connecticut Constitution will, there-

---

[9] "Connecticut courts have rejected the argument that the free-speech provisions of the Connecticut Constitution are independently actionable apart from a cause of action [for discharge or discipline in retaliation for the exercise of free speech] that is prescribed under § 13-52q." *Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 409 (D. Conn. 2017) (citing *Thibault v. Barkhamsted Fire Dist.*, No. CV136008093S, 2013 WL 6038259, at *5 (Conn. Super. Ct. Oct. 21, 2013)); *Blue v. Carbonaro*, No. CV146015705S,

fore, be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing analysis, the Court enters the following orders:

**(1)** All claims asserted against the defendants in their individual capacities for a violation of RLUIPA or in their official capacities seeking monetary damages for a violation of RLUIPA; all claims asserted under 42 U.S.C. § 1988; the claims that FOIA Liaisons Wright and Spotten violated Richard's rights by failing to timely or ever respond to his Connecticut FOIA requests; the request for a declaration that the defendants violated Richard's federal constitutional rights; the First Amendment free exercise claims asserted against Wardens Martin and Corcella, Deputy Wardens Cotta and Nunez, Commissioner Semple, and Captain Donovan; the First Amendment retaliation claim asserted against Correctional Officer Rodriguez; the First Amendment petition claims; the Fourth Amendment claims; the Fifth Amendment claims; the Eighth Amendment claims; the Ninth Amendment claims; the Fourteenth Amendment due process claims related to the processing and investigation of grievances; the Fourteenth Amendment deprivation of property claims; the Fourteenth Amendment equal protection claims; any claims asserted against the defendants in their official capacities seeking monetary damages for a violation of RLUIPA; and all claims asserted under Article First §§ 5, 6, 16 of the Connecticut Constitution are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). The Court declines to exercise supplemental jurisdiction over the claims asserted under Article First §§ 1, 3, 4, 8 of the Connecticut Constitution. *See* 28 U.S.C. § 1367(c). All claims asserted against Commissioner Scott Semple, Wardens Martin and Corcella, Deputy Wardens Cotta and Nunez, Captain Donovan, FOIA Liai-

2015 WL 3555294, at *21 (Conn. Super. Ct. May 11, 2015).

sons Wright and Spotten, and Grievance Coordinator King are **DISMISSED**.

With respect to the alleged confiscation of Richard's prayer shawl in 2019, Richard's First Amendment free exercise claims will **PROCEED** against Correctional Officer Rodriguez, Property Officers Witowski and Pudvah, Lieutenant Ocasio, and Captains Bellemare and Williams in their individual capacities, his First Amendment retaliation claims will **PROCEED** against Property Officer Pudvah and Lieutenant Bellemare in their individual capacities, and his claims asserted under RLUIPA will **PROCEED** against Correctional Officer Rodriguez, Property Officers Witowski and Pudvah, Lieutenant Ocasio, and Captains Bellemare and Williams in their official capacities to the extent that Richard seeks declaratory relief.

With respect to the alleged confiscation of Richard's prayer shawl and kurta in 2021, the following claims will **PROCEED** against Property Officer Pudvah: his First Amendment individual-capacity free exercise claim, his First Amendment individual-capacity retaliation claim, and his official-capacity claim asserted under RLUIPA to the extent that Richard seeks declaratory relief.

(2)     Within **twenty-one (21) days** of this Order, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshals Service. The U.S. Marshals Service shall serve the summons, a copy of the Amended Complaint, Doc. 15, and a copy of this Order on Captains Bellemare and Williams, Lieutenant Ocasio, Correctional Officer Rodriguez, and Property Officers Witowski and Pudvah in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06160.

(3)     Within **twenty-one (21) days** of this Order, the Clerk shall verify the current work addresses of: Captain Williams, Captain Bellemare, Lieutenant Ocasio, Correctional Officer Rodriguez, Property Officer Witowski, and Property Officer Pudvah and mail a copy of the Complaint, this Order, and a waiver of service of process request packet to each defendant in his or her individual capacity at his or her confirmed address. On the **thirty-fifth (35th) day** after mailing, the Clerk shall report to the Court on the status of each request. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4)     Defendants Captain Williams, Captain Bellemare, Lieutenant Ocasio, Correctional Officer Rodriguez, Property Officer Witowski, and Property Officer Pudvah shall file a response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the Notice of Lawsuit and Waivers of Service of Summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **six months (180 days)** from the date of this order. Discovery requests need not be filed with the Court.

(6)     All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

**(7)     If Richard changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that Richard MUST notify the Court.** Failure to do so can result in the dismissal of the case. Richard must give notice of a new address even if he is incarcerated. Richard should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Richard has more than one pending case, he should indicate all case numbers in the notification of change of address. Richard should also notify the defendants or the attorney for the defendants of his new address.

**(8)**     Richard shall utilize the Prisoner Efiling Program when filing documents with the Court. Richard is advised that the Program may be used only to file documents with the Court. Local Court Rule 5(f) provides that discovery requests are not to be filed with the Court. Therefore, discovery requests must be served on the defendant's attorney by regular mail.

**(9)**     The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy of the Standing Order to the parties. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

**(10)**     The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

It is SO ORDERED.

Dated: New Haven, Connecticut
        OCTOBER 6, 2022

                                        */s/ Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge